## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### (BID PROTEST)

ACCELGOV, LLC,

      *Plaintiff,*

v.

UNITED STATES,

      *Defendant.*

Case No. 26-878 _____

Judge Edward H. Meyers _____

███████████████████████

**Redacted Version**

### COMPLAINT

For its bid protest complaint against the United States of America, Plaintiff AccelGov, LLC shows the Court as follows:

### Nature of the Action

1.    This bid protest involves Solicitation No. 1779525 (the "Solicitation"), issued by the Defense Health Agency, Enterprise Medical Support, Contracting Division ("DHA"). AccelGov protests DHA's decision to exclude it from the competition.

### The Parties

2.    AccelGov is a Delaware limited liability company and an 8(a), woman-owned, small business joint venture between Agovx, LLC and 22nd Century Technologies, Inc.

3.    The United States of America, for all purposes relevant to this case, acted by and through DHA.

**Jurisdiction and Standing**

4.      The Tucker Act, as amended by the Administrative Dispute Resolution Act, gives this Court jurisdiction to "render judgment on an action by an interested party objecting [1] to a solicitation by a Federal agency for bids or proposals for a proposed contract or [2] to a proposed award or [3] the award of a contract or [4] any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); *Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 84 (2020) (dividing the Tucker Act into four prongs). *But see SRA Int'l, Inc. v. United States*, 766 F.3d 1409, 1411 (Fed. Cir. 2014) (dividing the Tucker Act into three prongs). An interested party is "an actual bidder or prospective bidder" that has "'a direct economic interest' in the procurement or proposed procurement." *Diaz v. United States*, 853 F.3d 1355, 1358 (Fed. Cir. 2017). After the protester demonstrates its interested party status, it must show it would have a substantial chance of award.[1] *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018). These requirements are met here.

5.      DHA intends to award a task order under a GSA "Health Information Technology Services" MAS contract pursuant to FAR Part 8.4. AccelGov is an actual bidder because it submitted a timely, responsive proposal to the Solicitation.

6.      DHA said AccelGov ███████████████████████████ and excluded it from the competition. But that does not mean that AccelGov lacks a direct economic interest or that it fails to meet the substantial chance test. Below, AccelGov explains that it did

---

[1] In the pre-award context, the "substantial chance" standard is applicable "[w]here bids have been submitted but award has not been made[.]" *Omran Holding Grp. v. United States*, 128 Fed. Cl. 273, 281 (2016).

more than meet the Solicitation's requirements, and that DHA's findings were unreasonable. Absent the errors discussed below, AccelGov would have proceeded in the competition with a substantial chance of award. AccelGov has a direct economic interest and satisfies the substantial chance test. *See, e.g.*, *RX Joint Venture, LLC v. United States*, 145 Fed. Cl. 207, 212 (2019) (finding the protester had standing because, without the challenged errors, it would have continued in the competition); *see also United Def., LLC v. United States*, 180 Fed. Cl. 405, 411 (2026) (noting that "the same showing may be pertinent to (and may even satisfy) both" the substantial chance test and direct economic interest analysis (quoting *REV, LLC v. United States*, 91 F.4th 1156, 1163-64 (Fed. Cir. 2024))). Therefore, AccelGov has standing and the Court has jurisdiction over this protest.

### The Pleading Standard

7.      The *Twombly* / *Iqbal* pleading standard applies at the U.S. Court of Federal Claims. *See Vanquish Worldwide, LLC v. United States*, 147 Fed. Cl. 390, 399 (2020). As Judge Kaplan noted, "a party need only plead 'facts to state a claim to relief that is plausible on its face,' and the alleged facts must be sufficient to nudge 'claims across the line from conceivable to plausible.'" *Id.* (quoting *TrinCo Inv. Co. v. United States*, 722 F.3d 1375, 1380 (Fed. Cir. 2013) (quoting, in turn, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). Judge Kaplan also explained that the Federal Circuit approves "information and belief" allegations under the appropriate circumstances. *Id.* (quoting *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1330 (Fed. Cir. 2009)).

8.      The *Vanquish* decision involved appeals under the Contract Disputes Act. *See id.* at 398. The government urged the court to dismiss the complaint because its allegations relied

on "mere 'suspicions,'" that did not meet the *Twombly* and Rule 8 pleading standards. *Id.* at 401.

Judge Kaplan disagreed and wrote:

> Fairly read, Vanquish's complaint alleges as a matter of fact that USTRANSCOM did not follow the OML process and that, had it been followed, Vanquish would have been assigned more missions than in fact it was assigned. **To be sure, Vanquish makes this allegation "on information and belief."** But that does not preclude it from meeting the *Twombly* plausibility standard, as the government contends. *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (observing that "[t]he *Twombly* plausibility standard ... does not prevent a plaintiff from 'pleading facts alleged on information and belief' where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible"); 5 Arthur R. Miller et al., *Federal Practice and Procedure* § 1224 (3d ed. 1998) ("Although there is no express authorization in the federal rules for pleading on information and belief, allegations in this form have been held to be permissible, even after the Twombly and Iqbal decisions."); *see also Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1330 (Fed. Cir. 2009) (reasoning that a plaintiff is permitted to make allegations based on information and belief even under heightened pleading standards, such as those established for fraud under Fed. R. Civ. P. 9(b), "when essential information lies uniquely within another party's control," at least "if the pleading sets forth the specific facts upon which the belief is reasonably based").

*Id.* (emphasis added). As Judge Kaplan noted, the Federal Circuit has approved of "information and belief" allegations "'when essential information lies uniquely within another party's control,' at least 'if the pleading sets forth the specific facts upon which the belief is reasonably based.'" *Id*. (quoting *Exergen Corp.*, 575 F.3d at 1330); *see also Innova Hosp. San Antonio, LP v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 730-31 (5th Cir. 2018) ("[W]hile a plaintiff must offer sufficient factual allegations to show that he or she is not merely engaged in a fishing expedition or strike suit, we must also take account of his or her limited access to crucial information. This is because if plaintiffs cannot state a claim without pleading facts which tend systemically to be in the sole possession of defendants, the remedial scheme of the statute will

4

fail, and the crucial rights secured by ERISA will suffer." (internal citations and annotations omitted)); *City of Evanston v. N. Ill. Gas Co.*, 229 F. Supp. 3d 714, 721 (N.D. Ill. 2017) ("Pleading on information and belief is a 'practical necessity' that is 'desirable and essential [ ] when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff but he has sufficient data to justify interposing an allegation on the subject.'"); *Gonzalez v. Cnty. of Merced*, No. 116CV01682LJOSAB, 2017 WL 2345681, *7 (E.D. Cal. May 30, 2017), *report and recommendation adopted*, 2017 WL 2812928 (E.D. Cal. June 29, 2017) ("Pleading on information and belief is a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff but he has sufficient data to justify interposing an allegation on the subject." (internal quotations omitted)).

9. AccelGov received a notice that it would "no longer be considered for award." The notice provided AccelGov's ratings, and the findings underlying each rating. AccelGov has no information about other offerors' proposals or DHA's complete evaluation. Thus, it is absolutely the case that "essential information lies uniquely within" DHA's control. Accordingly, AccelGov bases its allegations below on its own knowledge and, where appropriate, information and belief. Under the applicable pleading standard, AccelGov has sufficiently stated a claim. *See Exergen Corp.*, 575 F.3d at 1330.

### Factual Allegations

10. The Solicitation is a competitive acquisition for small businesses under FAR Part 8.4, set-aside for small business concerns. DHA sought a contractor "to provide operations and sustainment Information Technology (IT) services."

5

11.     DHA intends to award one task order on a best value basis and said, "[p]erformance period [will] be a Base Year of 12 months, inclusive of Transition, with four (4) 12-month option years and an optional six-month extension."

## A.     Evaluation Criteria

12.     The Solicitation said DHA would make award using the following three factors, listed in the descending order of importance:

> Factor 1 – Technical
>
> Factor 2 – Staffing Plan
>
> Factor 3 – Price

Each factor would receive an adjectival rating ranging from Unacceptable to Outstanding.

13.     Factor 1 has two subfactors: Subfactor 1 (Approach) and Subfactor 2 (Scenarios). The Solicitation said the Approach Subfactor is more important than the Scenarios Subfactor. Each subfactor would receive an adjectival rating ranging from Unacceptable to Outstanding.  In turn, DHA would assign Factor 1 ratings "based on the accumulation of aspects assigned" for each subfactor, but the Solicitation cautioned that "[a] rating in any Subfactor does not guarantee a particular rating[.]"

14.     For the Approach Subfactor, offerors had to provide their approach for meeting the PWS's requirements, and:

- "describe its understanding of the requirements, the current operational environment, and its high-level approach to providing the required services, which must include tiered support and ITIL 4 practices."

- "describe the characteristics, conditions, and/or variables it believes will have a direct and critical impact on the effectiveness, efficiency, and viability of the Offeror's approach."

- "describe its approach to risks and managing risks.  The Offeror will identify any significant risks it sees for providing the services and propose mitigations."

- "describe the overall timeline of activities from the Award Date through Transition and the implementation of its approach, to include critical milestones related to Transition."

- "describe its approach to meeting the performance requirements and service levels in the PRS.  The Offeror will also describe how it attends to the interdependencies with the CIO & PEO MS (J-6) and other service providers, including the EITSI and the DHAGSC."

- "describe its approach to implementing a unique Continual Improvement Practice (CIP) for DDSB requirements and its processes and practices around service improvement initiatives to ultimately migrate to one standard with the DHAGSC.  This shall include any innovative techniques the Offeror intends to use as part of its approach."

The Solicitation said DHA would "assess how the Offeror's proposal demonstrated" the following:

- "A clear and effective approach for meeting the requirements, including a complete understanding of the requirements and the current operational environment, such that the Government has a high level of confidence in the Offeror's success."

- "An approach which considers Transition timelines and constraints in current operational environment, and that demonstrates effective management of risk such that the Government has a high level of confidence in the Offeror's implementation and success."

- "A flexible and robust approach that can adjust to changing Government priorities, as well as processes and practices around service improvement, interdependencies, and innovative initiatives and techniques such that the Government has a high level of confidence in the Offeror's success and long-term value as a contractor providing services to the DHA."

7

15.    For the Scenarios Subfactor, offerors had to provide "an Oral Presentation" for these three different scenarios:

Scenario #1 – McAfee Policy Auditor Impact on Domain Controllers

Scenario #2 – Endpoint Management

Scenario #3 – ICAM & Cybersecurity Assurance

Although DHA allowed offerors to provide written submissions to support their presentations, DHA said it would not evaluate the written materials.  The Solicitation provided a structured presentation schedule, which included a "Q&A Session."  During the Q&A Session, the government could "engage in exchanges with Offerors[.]"  DHA would evaluate offerors' presentations to see if they demonstrate:

- "A practice that provides timely and professional services such that the Government has a high level of confidence in the Offeror's successful delivery of the required services."

- "A practice that has repeatable processes and methodologies that emphasize consistent obtainment of the required quality levels, such that the Government has a high level of confidence in the Offeror's success."

- "A practice that protects the DHA technical investment and innovates within the DDSB branch constraints, such that the Government has a high level of confidence in the Offeror's long-term value and success as a contractor."

16.    For Factor 2, offerors had to "submit [their] approach and capability to successfully staff with qualified personnel in a timely manner[.]"  There, DHA would assess the extent to which each offeror demonstrated its capability to successfully staff qualified personnel and its key personnels' qualifications, among other things.

8

17. DHA would evaluate price in Factor 3 for reasonableness, balance and completeness. The Solicitation said that prices "must be determined fair and reasonable to be eligible for award."

**B.      Evaluation and AccelGov's Exclusion from the Competition**

18. AccelGov submitted a timely proposal, with a price of ████████████ On May 29, the contracting officer informed AccelGov that DHA completed its evaluation and found that AccelGov ████████████████████████

19. The contracting officer also revealed that DHA gave AccelGov "a combined rating of ██████████ for Factor 1." This "combined rating" considered AccelGov's ████████████ rating for the Approach Subfactor and ██████████ rating for the Scenarios Subfactor.

20. For the Approach Subfactor, AccelGov received ████████████████████ weaknesses:





DHA found that AccelGov [REDACTED] and gave it an [REDACTED] rating for the Approach Subfactor.

21.    For the Scenarios Subfactor, AccelGov received [REDACTED] for Scenario #1 and this [REDACTED] for Scenario #2:



DHA found that AccelGov met the Solicitation's requirements for the Scenarios Subfactor and gave it an Acceptable rating.  However, DHA noted that the "Approach Subfactor is more important than the Scenarios Subfactor," and rated AccelGov [REDACTED] for Factor 1.

22.    DHA gave AccelGov [REDACTED] for Factor 2, and assigned it a [REDACTED] rating. The contracting officer did not provide any information about the price evaluation.  This protest follows.

**Count One**
**DHA unreasonably evaluated AccelGov under the Approach Subfactor**

23.    AccelGov adopts the allegations in the paragraphs above, as if fully set out herein.

10

24.     There is no question DHA had to evaluate AccelGov's quote reasonably against the stated evaluation criteria.  *See, e.g.*, *Tetra Tech, Inc. v. United States*, 137 Fed. Cl. 367, 383 (2017) ("Generally speaking, an agency must evaluate an offeror's proposal based on the criteria set out in the solicitation."); *OTI Am., Inc. v. United States*, 68 Fed. Cl. 646, 655 (2005); *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 652 (2003).  In doing so, DHA had to read AccelGov's proposal reasonably and give it a reasoned response.  *See 22nd Century Techs., Inc. v. United States*, 176 Fed. Cl. 389, 398 (2025).  The government acts unreasonably when it applies unstated evaluation criteria, or fails to read proposals reasonably.  *See Frawner Corp. v. United States*, 161 Fed. Cl. 420, 443 (2022); *OTI Am.*, 68 Fed. Cl. at 655; *22nd Century*, 176 Fed. Cl. at 398; *Barbaricum LLC v. United States*, 172 Fed. Cl. 186, 197 (2024).  That happened here when DHA unreasonably gave AccelGov ███████████ in the Approach Subfactor.

**A.     DHA deviated from the Solicitation and ignored AccelGov's effective operational risk management approach to give AccelGov its ███████████**

25.     DHA gave AccelGov a ██████ for its approach to managing risks.  DHA said AccelGov ████████████████████████████████ because the proposal supposedly ████████████████████████████████████ ████████████  DHA's rationale falls apart when looking at the Solicitation's instructions and AccelGov's proposal.

26.     First, the Solicitation did not require offerors to address the ███████████ ██████  The Solicitation directed offerors to "describe [their] approach to risks and managing risks."  In doing so, offerors had to "identify risks … for providing services and propose mitigations."  Neither the Solicitation nor the PWS even uses the phrase ███████ ██████

████████████████████████████████████████████████

27.    AccelGov followed the Solicitation.  AccelGov █████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████    There is no question that AccelGov followed the Solicitation's

instructions.  Had DHA intended offerors to include ████████████████ in their risk

management approach, the Solicitation should have made that clear.  *See Blue Tech Inc. v.*

*United States*, 155 Fed. Cl. 229, 240 (2021).  DHA was "bound to follow the … terms as written,

not how [it] wishes it had written them."  *WaveLink, Inc. v. United States*, 154 Fed. Cl. 245, 274

(2021).  DHA's deviation from the Solicitation was unreasonable.

28.    Even assuming DHA's reference to the ████████████████████ derives

from the separate instruction to describe "its understanding" of the PWS requirements, AccelGov

satisfied that requirement as well.  In the background section, the PWS says that the contractor

will manage three RMF Authority-to-Operate systems: "Multi-Purpose Kiosk | Desktop As A

Service (DHAMPK-DaaS); Medical 365 (MED365); and Medical Joint Active Directory

(mJAD) IT Systems."  AccelGov's proposal included ██████████████████

████████████████    that addressed "all non-task PWS requirements in accordance with the

solicitation instructions."  (emphasis omitted).  For "General Requirements (PWS 1.0-2.0, 6.0),"

AccelGov said it would ████████████████████████

████████████████████████████████████████████████████████████

███████████    (emphasis omitted).  AccelGov also ██████████████████ when discussing its

approach and understanding of the requirements, as shown in the following examples:





AccelGov clearly addressed any requirement related to the MED365, mJAD, and DHAMPK-DaaS ATOs. The ███████████████████████████████ was unreasonable.

29.    DHA also faulted AccelGov for supposedly failing to include ██████████ ██████████ but that criticism does not align with AccelGov's proposal. In volume II, section 1.4, AccelGov proposed to ███████████████████████████████████████ ███████████████████████████████ AccelGov explained that its ███████████████████████████████████████████ ███████████████████████████████████████████

13

███████████████████████████████████████████

███████ Figure 1.4-1 shows AccelGov's full methodology:



The methodology includes ████████████████████████████████ ████████████████████████████████ is, by definition, a preventative RMF process. DHA's contrary finding was not based on a reasonable reading of AccelGov's proposal.

30.    As a whole, DHA's concerns were inconsistent with the Solicitation and AccelGov's proposal, so this ███████████ was unreasonable.

**B.    DHA's ███████████ unreasonably penalized AccelGov's timeline presentation format.**

31.    The Approach Subfactor directed offerors to "describe the overall timeline of activities from the Award Date through Transition and the implementation of its approach, to include critical milestones related to Transition." AccelGov addressed the requirement in

████████████████████████████████████

████████████████████████████████████

██████████████████████

██████████████████████████████████████



The figure includes the ███████████████████.

32.     Although DHA acknowledged that AccelGov provided a timeline, it gave

AccelGov a █████ ████████ for ████████████████████████████████████

████████████████████████████████████████████ That ████████

faulted AccelGov for providing a timeline depiction, instead of a narrative description.  This

finding was unreasonable.

33.     The Court of Federal Claims interprets solicitations applying the same interpretive

principles applicable to contracts.  *Safeguard Base Operations, LLC v. United States*, 989 F.3d

1326, 1344 (Fed. Cir. 2021).  And, unless a special meaning is clear, the Court of Federal Claims

gives terms their ordinary meaning.  *See G4S Secure Integration LLC v. United States*, 161 Fed. Cl. 387, 401 (2022).  In this case, the question is whether the term "describe" required offerors to provide a timeline in narrative form, rather than as a figure or illustration.  "Describe" generally means "to represent or give an account of in words," or "to represent by a figure, model, or picture[.]"  *See Describe*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/describe (last visited June 15, 2026).  By its ordinary meaning, AccelGov "describe[d] the overall timeline" with its Figure 1.5-1.  No narrative was required.

34.    Had DHA intended to require a narrative as the exclusive timeline format, it should have said so.  *See Blue Tech Inc.*, 155 Fed. Cl. at 240 (noting that if the agency sought a specific response in proposals, "it could have crafted" the solicitation's language "more narrowly").  Unfortunately for DHA, that is not what the Solicitation said.  DHA's interpretation departed from the term's ordinary meaning, and was therefore unreasonable.  As such, this ▆▆▆▆▆ should not stand.

35.    However, if DHA's interpretation was reasonable, then the Solicitation was susceptible of two or more reasonable readings, meaning it was ambiguous.  *See, e.g.*, *Banknote Corp. of Am.*, 365 F.3d at 1353.  There are two types of ambiguities: patent and latent.  *See, e.g.*, *Sunshine Constr. & Eng'g, Inc. v. United States*, 64 Fed. Cl. 346, 358 (2005).  A patent ambiguity "is one that is 'obvious, gross, glaring' or 'an obvious omission, inconsistency, or discrepancy in significance,' such that the error is readily apparent," while a latent ambiguity "is a 'hidden or concealed defect'" that may only become evident during evaluation.  *Oenga v. United States*, 109 Fed. Cl. 108, 141 (2010), *on reconsideration in part,* 97 Fed. Cl. 80 (2011) (quoting *W. Bay Builders, Inc. v. United States*, 85 Fed. Cl. 1, 15 (2008)); *RELI Grp., Inc.*, B-412380, Jan. 28, 2016, 2016 CPD ¶ 51, at *6.

36.    Here, it was not apparent or obvious that DHA would require a narrative over any other format describing the timeline.  DHA's interpretation only came to light after AccelGov received the notice from the contracting officer detailing this weakness.  To the extent there was an ambiguity here, it was latent.  For that reason, the Court should require DHA to either evaluate proposals in a manner consistent with AccelGov's reasonable interpretation, or amend the Solicitation and allow the offerors with this weakness to resubmit proposals based on a common understanding.  *See 22nd Century Techs., Inc.*, 176 Fed. Cl. at 398 n.4; *FirstLine Transp. Sec., Inc. v. United States*, 100 Fed. Cl. 359, 403 (2011).

**C.    DHA's ▉▉ ▉▉▉▉ overlooks AccelGov's clear approach to meeting the PRS.**

37.    The Approach Subfactor also required offerors to describe their approach to meeting the performance requirements and service levels in the PRS.  For this requirement, each offeror had to "describe how it attends to the interdependencies with the CIO & PEO MS (J-6) and other service providers[.]"

38.    AccelGov addressed this requirement in ▉▉▉▉▉▉▉▉▉▉▉.  In the last sentence dedicated to this issue, AccelGov proposed to ▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ DHA seized on this one sentence and gave AccelGov a ▉▉ ▉▉▉▉ for ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ But AccelGov's proposal said more than DHA credited.

39.    In addition to , AccelGov's ⬛⬛⬛ said:



40.    AccelGov's discussion also incorporated ⬛⬛⬛⬛ by reference. There, AccelGov provided more information about its approach to meet the PRS.  For example, AccelGov said this about meeting the PRS's performance requirements in the PRS:



41.    AccelGov also discussed the PRS's service level requirements in ⬛⬛⬛ ⬛ Specifically, AccelGov ⬛⬛⬛⬛⬛

18

⬛⬛⬛⬛⬛⬛⬛⬛

██████████████████████████████████████████████████

████████████████████████████████████████ AccelGov also explained

that ███████████████████████████████████████████████

███████████████████████████████████████ which is directly responsive to

service level requirement 2.1.1.  Additionally, AccelGov said its ███████████

███████████████████████████ complying with service level requirement 2.6.1.

42.     AccelGov clearly provided an approach to meeting the PRS.  DHA overlooked

this discussion when it gave AccelGov the ████████████ which made the ████████

unreasonable.  *See 22nd Century Techs., Inc.*, 176 Fed. Cl. at 397 (sustaining a protest where

"[t]he [a]gency appears simply to have missed the relevant discussion").

**D.     AccelGov provided more than a ████████████████ so the ████ ███████
         is unreasonable, too.**

43.     For the final Approach Subfactor requirement, offerors had to provide an

"approach to implementing a unique Continual Improvement Practice (CIP)[.]"  DHA thought

AccelGov ████████████████████████ approach, but AccelGov's proposal told a different

story.

44.     AccelGov provided its unique CIP approach, ████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████ Aside from the step-

19

██████████████████████████████████████████████████

by-step narrative explanation, AccelGov included this visual for its approach:



AccelGov also detailed how it would implement its approach:



45.    AccelGov clearly provided more than a ██████████ approach.  DHA's contrary conclusion was unreasonable.

**E.    DHA's errors prejudiced AccelGov.**

46.    The Solicitation said DHA would assign an overall Factor 1 rating "based on the accumulation of aspects assigned."  Reasonably evaluated, AccelGov would have no weaknesses under the most important Subfactor, leading to an ██████ rating.  As evaluated, AccelGov would also have an ████████ rating in the Scenarios Subfactor, with ██████████

20

████████████████████████████████████████████████

████████   Had DHA reasonably evaluated AccelGov, it would at least be rated ████████ for Factor 1, ████ for Factor 2 and have a competitive price. AccelGov would have remained in the competition with a substantial chance of award. The Court should sustain this protest.

**Count Two**
**DHA unreasonably evaluated AccelGov in the Scenarios Subfactor**

47.   AccelGov adopts the allegations in the paragraphs above, as if fully set out herein.

48.   As explained above, agencies must follow stated evaluation criteria and give proposals a reasonable reading. *See Frawner Corp.*, 161 Fed. Cl. at 443; *OTI Am.*, 68 Fed. Cl. at 655; *22nd Century*, 176 Fed. Cl. at 398. Not only did DHA depart from these principles when evaluating the Approach Subfactor, but also in the Scenarios Subfactor evaluation.

49.   For the Scenarios Subfactor, DHA gave AccelGov a ████████ for Scenario #2 – Endpoint Management. The ████████ was based, in part, on a supposed failure ████████ ████████████████████████████████████████ DHA's finding departed from the instructions and AccelGov's presentation.[2]

50.   The instructions for each scenario included background information, an operational scenario and questions, among other things. DHA said this for Scenario #2's operational scenario:

> Throughout the transition to co-management and then to cloud, operational work continues as well. The team receives reports of entire sites unable to utilize MHS Genesis or VMware Horizon Client. Clinics reported .NET errors when they attempted to launch Citrix Workspace

---

[2] We recognize that offerors' written submissions were not evaluated for the Scenarios Subfactor. However, AccelGov's written materials reflect its presentation's contents.

████████████████████████████████████████████████████

used when connecting to MHS Genesis.

Offerors also had to provide their approach related to the following five questions:

**Issue Handing**: What solutions would you propose to ensure the transitions while minimizing site and user impact and maintaining security compliance?

**Root Cause Analysis**: What are the investigative steps for identifying the root cause of any issues encountered during the transition?

**Permanent Resolution**: What solutions would you propose to ensure the transition to Co-Management is successful while also minimizing user impact and maintaining security compliance?

**Incident Handling**: Using the example of the transition consequences, what immediate and long-term mitigations would you implement for other potential issues?

**Operational Stability**: Discuss your approach to investigating and resolving user issues, such as the .NET error, even while managing the transition of the environment to the cloud.

51.     Scenario #2 did not mention "Zero Trust." In fact, the only reference to "Zero Trust" was in Scenario #3. Because Scenario #2 did not involve (or require discussion of) "Zero Trust," DHA could not reasonably downgrade AccelGov for failing to address it.

52.     Also, contrary to the assigned weakness, AccelGov addressed the ███████ ████████████████ For example, AccelGov said,



To address these challenges, AccelGov proposed to ████████████████ ███████████████████████████████████████

████████████████████████████████████

53.   AccelGov explained that its

Moreover, AccelGov's

54.   AccelGov's proposal clearly addressed the transition to a cloud-native environment.  DHA's inconsistent finding was unreasonable.

55.   Had DHA reasonably evaluated AccelGov, it would have identified no ██████ under the Approach Subfactor, and ████████ under the Scenarios Subfactor.  At a minimum, the elimination of these errors would have left AccelGov with ██ ██████ and ██ ██████ ███████ for Factor 1.  That warranted at least an ████████ rating under the Solicitation's rating scheme.  Combined with its ████ rating for Factor 2 and competitive price, AccelGov would have remained in the competition with a substantial chance of award.

56.   A ████ rating for Factor 1 was equally attainable.  The Solicitation provides that a Good rating was appropriate where strengths outweighed the weaknesses.  In a reasonable evaluation, DHA could have concluded that the ██ ███████████████ ████████████ ██████ ████████ in Factor 1 to obtain a ████ rating.  With ████ ratings for both non-price factors and a competitive price, AccelGov would have remained in the competition with a substantial chance of award.  The Court should sustain this protest.

**Prayer for Relief**

WHEREFORE, AccelGov respectfully requests that this Court:

A.    Enter a preliminary injunction enjoining DHA from proceeding with award pending the outcome of this protest;

B.    Declare DHA's evaluation and award decision were arbitrary, capricious and contrary to law;

C.    Permanently enjoin DHA from proceeding with award based on the current evaluation;

D.    Require DHA to perform a new evaluation and make a new award decision; and

E.    Award AccelGov such other and further relief as the Court may deem just and proper, including bid and proposal costs.

Dated: June 15, 2026                                    Respectfully submitted,

                                                        /s/ W. Brad English
                                                        W. Brad English
                                                        Emily J. Chancey
                                                        Taylor R. Holt
                                                        Hunter M. Drake

                                                        *Attorneys for AccelGov, LLC*

**OF COUNSEL:**

MAYNARD NEXSEN PC
223 Washington Street NE, Suite 500
Huntsville, Alabama 35801
256.512.5705
benglish@maynardnexsen.com

echancey@maynardnexsen.com
taholt@maynardnexsen.com
hdrake@maynardnexsen.com

## Certificate of Service

I hereby certify that on June 15, 2026, I caused copies of the foregoing to be served by

electronic mail upon the following:

> U.S. Department of Justice
> Commercial Litigation Branch
> National Courts Section
> P.O. Box 480
> Ben Franklin Station
> Washington, D.C., 20044

*/s/ W. Brad English*
Of Counsel