**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

**Redacted Version**

| | |
|---|---|
| **ACCELGOV, LLC,**<br><br>*Plaintiff,*<br><br>v.<br><br>**UNITED STATES,**<br><br>*Defendant.* | Case No. 26-878<br>Judge Edward H. Meyers<br><br>[redacted]<br><br>[redacted] |

**AMENDED AND RESTATED COMPLAINT**

In accordance with Rule 15(a) of the *Rules of the United States Court of Federal Claims* and this Court's Order (doc. 32), AccelGov LLC amends and restates its complaint and respectfully shows the Court as follows:

**The Parties**

1. AccelGov is a Delaware limited liability company and an 8(a), woman-owned, small business joint venture between Agovx, LLC and 22nd Century Technologies, Inc.

2. The United States of America, for all purposes relevant to this case, acted by and the Defense Health Agency, Enterprise Medical Support, Contracting Division ("DHA").

**Jurisdiction**

3. The Tucker Act, as amended by the Administrative Dispute Resolution Act, gives this Court jurisdiction to "render judgment on an action by an interested party objecting [1] to a solicitation by a Federal agency for bids or proposals for a proposed contract or [2] to a proposed

award or [3] the award of a contract or [4] any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); *Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 84 (2020) (dividing the Tucker Act into four prongs). *But see SRA Int'l, Inc. v. United States*, 766 F.3d 1409, 1411 (Fed. Cir. 2014) (dividing the Tucker Act into three prongs). An interested party is "an actual bidder or prospective bidder" that has "'a direct economic interest' in the procurement or proposed procurement." *Diaz v. United States*, 853 F.3d 1355, 1358 (Fed. Cir. 2017). After the protester demonstrates its interested party status, it must show it would have a substantial chance of award.[1] *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018). These requirements are met here.

4. DHA intends to award a task order under a GSA "Health Information Technology Services" MAS contract pursuant to FAR Part 8.4. (Tab 154, AR 1198.) AccelGov is an actual bidder because it submitted a timely, responsive proposal to the Solicitation. (*See* Tab 499, AR 3052, Tab 222)

5. DHA removed AccelGov from the competitive range because of its Unacceptable rating in Approach Subfactor, which resulted in an Unacceptable rating in the Technical Factor overall. (Tab 499, AR 3122.) But that does not mean that AccelGov lacks a direct economic interest or that it fails to meet the substantial chance test. Below, AccelGov explains that DHA's findings were unreasonable. Absent the errors discussed below, AccelGov would have proceeded in the competition with a substantial chance of award. AccelGov has a direct

[1] In the pre-award context, the "substantial chance" standard is applicable "[w]here bids have been submitted but award has not been made[.]" *Omran Holding Grp. v. United States*, 128 Fed. Cl. 273, 281 (2016).



[redacted]

economic interest and satisfies the substantial chance test. *See, e.g.*, *RX Joint Venture, LLC v. United States*, 145 Fed. Cl. 207, 212 (2019) (finding the protester had standing because, without the challenged errors, it would have continued in the competition); *see also United Def., LLC v. United States*, 180 Fed. Cl. 405, 411 (2026) (noting that "the same showing may be pertinent to (and may even satisfy) both" the substantial chance test and direct economic interest analysis (quoting *REV, LLC v. United States*, 91 F.4th 1156, 1163-64 (Fed. Cir. 2024))). Therefore, AccelGov has standing and the Court has jurisdiction over this protest.

**Factual Allegations**

6. DHA is a joint, integrated Combat Support Agency "enabling the Army, Navy, and Air Force Medical Departments to provide a medically ready force and a ready medical force to Combatant Commands in both peacetime and wartime." (Tab 13, AR 229.) DHA administers the TRICARE Health Plan, which provides worldwide medical, dental, and pharmacy programs to more than 9.4 million uniformed service members, retirees, and their families. (*Id.*) Additionally, DHA manages the Military Health System, a global, comprehensive, integrated system that includes combat medical services, peacetime health care delivery, public health services, medical education and training, and medical research and development. (*Id.*)

7. The DHA, Infrastructure and Operations Division, Domain and Directory Services Branch ("DDSB") was chartered to "operate and sustain the IT footprint and environments for the medical activities, Other Lines of Business (for example, research), and some Veteran Administrative Activities." (Tab 13, AR 229.) DDSB supports a customer base that extends to the Army, Navy, and Air Force medical entities worldwide. (*Id.*) To support its



[redacted]

mission, DHA issued Request for Proposals 1779525 (the "Solicitation") under the General Services Administration Health Information Services Multiple Award Schedule, seeking a "contractor to provide IT Architectural, Engineering, [Operations & Sustainment], and expert technical services to DDSB's IT systems which have an Authorization to Operate (ATO)."[2] (*Id.*)

8. DHA issued the Solicitation as a competitive acquisition under FAR Part 8.4, set-aside for small business concerns. (Tab 154, AR 1198.) The Solicitation also included and incorporated the procedures of FAR Part 15, Contracting by Negotiation, and the DFARS. (*Id.*) Ultimately, DHA intends to award one firm-fixed price task order on a best value basis. (*Id.*, AR 1198, 1199.) DHA said the performance period would be a base year of eleven months, following a one-month transition, with four twelve-month option years and an optional six-month extension. (Tab 147, AR 1134.)

**Evaluation Criteria**

9. The Solicitation said DHA would make award using the following three factors, listed in descending order of importance:

Factor 1 – Technical

Factor 2 – Staffing Plan

[2] An ATO is a formal security certification from a designated official that confirms a system meets the government's cybersecurity requirements. *See Authorization to Operate*, CMS CyberGeek, https://security.cms.gov/learn/authorization-operate-ato (last visited Aug. 18, 2026). An ATO authorizes a system to operate on government networks and handle sensitive information. *See id.* Each ATO is registered in the Enterprise Mission Assurance Support Service ("eMASS") system—a government-owned web application for managing cybersecurity, assessment and authorization. *See Enterprise Mission Assurance Support Service,* Def. Counterintelligence and Sec. Agency, https://www.dcsa.mil/Systems-Applications/Enterprise-Mission-Assurance-Support-Service-eMASS/ (last visited Aug. 18, 2026).



[redacted]

Factor 3 – Price

(Tab 154, AR 1199.) Factor 1 has two subfactors: Subfactor 1 (Approach) and Subfactor 2 (Scenarios). (*Id.*) The Approach Subfactor was more important than the Scenarios Subfactor. (*Id.*) When combined, the non-Price factors were "significantly more important than Price[,] [h]owever, Price may be a controlling factor where an overall higher evaluated price is unaffordable." (*Id.*) Moreover, the "closer the ratings in the non-price factors, the more significant price becomes." (*Id.*)

10. Each non-Price factor and subfactor proposal would be evaluated "for its capability for meeting the requirements and assigned a rating, as shown in the table below, based on the accumulation of aspects (i.e., Significant Strengths, Strengths, Weaknesses, Significant Weaknesses, Deficiencies) assigned[:]"

| | |
|---|---|
| Outstanding | A proposal that meets the requirements of the solicitation and has any accumulation of significant strengths and/or strengths which greatly outweighs any accumulation of weaknesses and/or significant weaknesses. |
| Good | A proposal that meets the requirements of the solicitation and has any accumulation of significant strengths and/or strengths which outweighs, but not greatly, any accumulation of weaknesses and/or significant weaknesses |
| Acceptable | A proposal that meets the requirements of the solicitation and has any accumulation of significant strengths and/or strengths which is offset by any accumulation of weaknesses and/or significant weaknesses. |
| Unacceptable | A proposal that has any deficiency(s); or a quotation that has any accumulation of significant weaknesses and/or weaknesses which outweighs any accumulation of strengths and/or significant strengths. |

(Tab 154, AR 1199-200.) The Solicitation defined Significant Strengths, Strengths, Weaknesses, Significant Weaknesses, and Deficiencies as follows:



[redacted]

| | |
|---|---|
| Significant Strength | Any aspect of a proposal that, when judged against a stated evaluation criterion, substantially enhances the merit of the proposal, substantially exceeds specified performance or service level requirements in a way that will be advantageous to the Government, or substantially increases the probability of successful performance. |
| Strength | Any aspect of a proposal that, when judged against a stated evaluation criterion, enhances the merit of the proposal, exceeds specified performance or service level requirements in a way that will be advantageous to the Government, or increases the probability of successful performance. |
| Significant Weakness | Any aspect of a proposal that, when judged against a stated evaluation criterion, substantially increases the risk of unsuccessful performance. |
| Weakness | Any aspect of a proposal that, when judged against a stated evaluation criterion, increases the risk of unsuccessful performance. |
| Deficiency | Any aspect of a proposal that fails to meet a material Government requirement, or an accumulation of weaknesses and/or significant weaknesses in the quotation that increases the risk of unsuccessful performance to an unacceptable level. |

(*Id.*, AR 1184-85.) While DHA would assign Technical ratings "based on the accumulation of aspects assigned" for each subfactor, the Solicitation cautioned that "[a] rating in any Subfactor does not guarantee a particular rating for the Technical Factor." (*Id.*, AR 1200.)

11. For the Approach Subfactor, offerors had to provide their approach for meeting the PWS's requirements, and:

- "describe its understanding of the requirements, the current operational environment, and its high-level approach to providing the required services, which must include tiered support and ITIL 4 practices."
- "describe the characteristics, conditions, and/or variables it believes will have a direct and critical impact on the effectiveness, efficiency, and viability of the Offeror's approach."
- "describe its approach to risks and managing risks. The Offeror will identify any significant risks it sees for providing the services and propose mitigations."



[redacted]

- "describe the overall timeline of activities from the Award Date through Transition and the implementation of its approach, to include critical milestones related to Transition."

- "describe its approach to meeting the performance requirements and service levels in the [Performance Requirements Summary ("PRS")]. The Offeror will also describe how it attends to the interdependencies with the CIO & PEO MS (J-6) and other service providers, including [] the DHAGSC."

- "describe its approach to implementing a unique Continual Improvement Practice (CIP) for DDSB requirements and its processes and practices around service improvement initiatives to ultimately migrate to one standard with the DHAGSC. This shall include any innovative techniques the Offeror intends to use as part of its approach."

(Tab 154, AR 1191.) The Solicitation said DHA would "assess how the Offeror's proposal demonstrated" the following:

- "A clear and effective approach for meeting the requirements, including a complete understanding of the requirements and the current operational environment, such that the Government has a high level of confidence in the Offeror's success."

- "An approach which considers Transition timelines and constraints in current operational environment, and that demonstrates effective management of risk such that the Government has a high level of confidence in the Offeror's implementation and success."

- "A flexible and robust approach that can adjust to changing Government priorities, as well as processes and practices around service improvement, interdependencies, and innovative initiatives and techniques such that the Government has a high level of confidence in the Offeror's success and long-term value as a contractor providing services to the DHA."

(*Id.*, AR 1200.)

12. For the Scenarios Subfactor, offerors had to provide "an Oral Presentation" for these three different scenarios:



[redacted]

Scenario #1 – McAfee Policy Auditor Impact on Domain Controllers

Scenario #2 – Endpoint Management

Scenario #3 – ICAM & Cybersecurity Assurance

(Tab 154, AR 1191-92.) Although DHA allowed offerors to provide written submissions to support their presentations (including the slides they intended to present), DHA said it would not evaluate the written materials. (*Id.*, AR 1192) The Solicitation provided a structured presentation schedule for the oral presentations, which included a "Q&A Session." (*Id.*) During the Q&A Session, the government could "engage in exchanges with Offerors[.]" (*Id.*) DHA would evaluate offerors' presentations to see if they demonstrate:

- "A practice that provides timely and professional services such that the Government has a high level of confidence in the Offeror's successful delivery of the required services."
- "A practice that has repeatable processes and methodologies that emphasize consistent obtainment of the required quality levels, such that the Government has a high level of confidence in the Offeror's success."
- "A practice that protects the DHA technical investment and innovates within the DDSB branch constraints, such that the Government has a high level of confidence in the Offeror's long-term value and success as a contractor."

(*Id.*, AR 1200-01.)

13. For the Staffing Plan Factor, offerors had to "submit [their] approach and capability to successfully staff with qualified personnel in a timely manner[.]" (Tab 154, AR 1194.) Offerors had to submit information about their staffing approach and identify the individuals they proposed to fulfil the PWS's key personnel requirements. (*Id.*) DHA said it



[redacted]

would assess the extent to which each offeror demonstrated its capability to successfully staff qualified personnel and its key personnels' qualifications, among other things. (*Id.*, AR 1201.)

14. Finally, for the Price Factor, offerors were instructed to complete a government provided price matrix. (Tab 154, AR 1196.) DHA said it would evaluate each proposed price for "reasonableness, balance, and completeness." (*Id.*, AR 1201.) DHA also said it would evaluate price using various price analysis techniques and procedures, including, but not limited to, price comparison and comparison against the Independent Government Cost Estimate. (*Id.*)

15. DHA said it intended to evaluate proposals and make award without discussions. (Tab 154, AR 1184.) Therefore, it cautioned offerors that their initial proposal "should contain the Offeror's best terms from a cost or price and technical standpoint." (*Id.*)

**Proposal Evaluation and AccelGov's Exclusion from the Competitive Range**

16. DHA received [redacted] proposals in response to the Solicitation, including AccelGov's timely and compliant proposal. (Tab 499, AR 3052.) DHA excluded [redacted] proposals for non-compliance with the Solicitation's instructions. (*Id.*) DHA evaluated the remaining [redacted] proposals and eliminated [redacted] additional offerors due to organizational conflicts of interest. (*Id.*, AR 3124.) DHA then sought to establish a competitive range among the [redacted] remaining offerors. (*See id.*, AR 3124-25.) DHA excluded offerors with an Unacceptable rating in one or more subfactor or factor from the competitive range. (*See id.*, AR 3124 ("Offerors who will NOT remain in the competitive range as they are not among the most highly rated and all have a rating of Unacceptable in one or more Subfactor or Factor[.]").) For the Court's ready reference, these were the ratings and total evaluated prices for the [redacted] offerors included in competitive range:



[redacted]

| Offeror | Factor 1 Technical | | | Factor 2 Staffing Plan | Total Evaluated Price |
|---|---|---|---|---|---|
| | Overall | Subfactor 1 Approach | Subfactor 2 Scenarios | | |
| [redacted] | | | | | |

(*See* Tab 499, AR 3124-25.) And these were the ratings and total evaluated prices for the [redacted] offerors not included in the competitive range due to their Unacceptable ratings:

| Offeror | Factor 1 Technical | | | Factor 2 Staffing Plan | Total Evaluated Price |
|---|---|---|---|---|---|
| | Overall | Subfactor 1 Approach | Subfactor 2 Scenarios | | |
| [redacted] | | | | | |
| AccelGov | Unacceptable | Unacceptable | [redacted] | [redacted] | [redacted] |
| [redacted] | | | | | |



[redacted]

[redacted]

(*See id.*, AR 3124.)

17. As shown above, AccelGov had an Unacceptable rating in the Approach Subfactor. (Tab 499, AR 3096.) DHA said AccelGov's proposal warranted an Unacceptable rating because "[redacted]." (*Id.*, AR 3096.)[3] While the "evaluators found [redacted] (*Id.*) DHA found these [redacted] in AccelGov's proposal:

[redacted]

[3] AccelGov's Technical and Staffing Plan findings were virtually identical in DHA's competitive range determination, technical evaluation report, and staffing plan evaluation. (*Compare* Tab 492, AR 3000-02, *and* Tab 485, AR 2958-59, *with* Tab 499, AR 3095-97.) We cite to the findings in the competitive range determination (Tab 499) throughout.

[4] "MED365" stands for "Medical 365." (Tab 147, AR 1147.) "mJAD" stands for "medical Joint Active Directory." (*Id.*) And "DDHAMPK-Daas" stands for "Defense Health Agency Multi-Purpose Kiosk | Desktop As A Service." (*Id.*)



[redacted]

[redacted]

(*Id.*, AR 3095.)

18. For the Scenarios Subfactor, AccelGov got [redacted], and this [redacted]:

[redacted]

(Tab 499, AR 3096.) Finally, the evaluators found AccelGov "[redacted]."



[redacted]

(*Id.*) All of this resulted in AccelGov receiving an [redacted] rating for its Scenarios Subfactor proposal. (Tab 499, AR 3097.) DHA said AccelGov's overall Technical Factor was "determined to be UNACCEPTABLE and did not meet the requirements of the [S]olicitation, based on the accumulation of aspects (i.e., Significant Strengths, Strengths, Weaknesses, Significant Weaknesses, and Deficiencies) assigned and the relative importance of the two subfactors." (Tab 499, AR 3097.)

19. AccelGov received a [redacted] rating for the Staffing Plan Factor because its [redacted] (Tab 499, AR 3122.) DHA removed AccelGov from the competitive range because of its Unacceptable rating in Approach Subfactor, which resulted in an Unacceptable rating in the Technical Factor overall. (*See id.*) DHA said it would take "significant proposal revisions" for AccelGov to "remain competitive." (*Id.*, AR 3125.) After establishing the competitive range, DHA said it would "enter discussions with all remaining Offerors in the competitive range." (*Id.*)

**Count I**
**DHA's evaluation of AccelGov's proposal under the Technical Factor was unreasonable because it is contradicted by what AccelGov wrote**

20. AccelGov adopts and incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

21. "Generally speaking, an agency must evaluate an offeror's proposal based on the criteria set out in the solicitation." *Tetra Tech, Inc. v. United States*, 137 Fed. Cl. 367, 383 (2017); *OTI Am., Inc. v. United States*, 68 Fed. Cl. 646, 655 (2005) (quoting *Banknote Corp. of*

*Am. v. United States,* 56 Fed. Cl. 377, 386 (2003), *aff'd,* 365 F.3d 1345 (Fed. Cir. 2004)); *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 652 (2003) (quoting *Dubinsky v. United States,* 43 Fed. Cl. 243, 259 (1999)) ("[A]s this Court has recognized, 'making offerors aware of the rules of the game in which they seek to participate is fundamental to fairness and open competition.'"). In doing so, DHA had to read AccelGov's proposal reasonably and give it a reasoned response. *See 22nd Century Techs., Inc. v. United States*, 176 Fed. Cl. 389, 398 (2025). The government acts unreasonably when it applies unstated evaluation criteria, or fails to read proposals reasonably. *See Frawner Corp. v. United States*, 161 Fed. Cl. 420, 443 (2022); *OTI Am.*, 68 Fed. Cl. at 655; *22nd Century*, 176 Fed. Cl. at 398; *Barbaricum LLC v. United States*, 172 Fed. Cl. 186, 197 (2024).

22. Additionally, "a technical evaluation is arbitrary and capricious" where "the administrative record contradicts the agency's decision in some objective way." *See Barbaricum LLC*, 172 Fed. Cl. at 197 (first citing *DZSP 21, LLC v. United States*, 139 Fed. Cl. 110, 118 n.9 (2018); and then citing *Allicent Tech., LLC v. United States*, 166 Fed. Cl. 77, 115 (2023), *as amended* (July 18, 2023), *reconsideration denied,* No. 22-1380C, 2023 WL 4287196 (Fed. Cl. June 30, 2023)); *Allicent Tech., LLC*, 166 Fed. Cl. at 115 ("Simply stating that [the protester] failed to provide an approach when the proposal plainly discusses its approach, does not comport with the record."). Specifically, "if an agency rests its decision on finding that a proposal fails to mention 'Item X,' and if the proposal does in fact mention Item X, the agency has acted arbitrarily and capriciously because its conclusion is irrational." *Barbaricum LLC*, 172 Fed. Cl. at 197. The Court can set aside the agency action on that basis. *Id.* That is true even where the Court has "no idea what Item X is, what it does, or why it is important." *Id.* DHA departed from these principles by unreasonably evaluating AccelGov's proposal under the Technical Factor.



[redacted]

23. DHA gave AccelGov an Unacceptable in the Technical Factor because it "[redacted] (Tab 499, AR 3097.) Put differently, DHA believed that AccelGov deserved an overall Technical rating of Unacceptable because [redacted]. (*See id.*, AR 3095-96 (listing AccelGov's strengths and weaknesses); Tab 154, AR 1199-200 (stating that an Unacceptable rating is appropriate when "any accumulation of significant weaknesses and/or weaknesses . . . outweighs any accumulation of strengths and/or significant strengths.").) As we will see below, each of the weaknesses DHA gave AccelGov was unreasonable and unwarranted. That made AccelGov's overall Technical evaluation unreasonable. We begin with the [redacted] weaknesses AccelGov received under the Approach Subfactor. We then turn our attention to the Scenarios Subfactor.

**The [redacted] weaknesses DHA gave AccelGov under the Approach Subfactor were not based on a reasonable reading of AccelGov's proposal and are therefore unreasonable.**

24. DHA gave AccelGov an Unacceptable rating for the Approach Subfactor because [redacted] (Tab 499, AR 3096.) None of AccelGov's weaknesses under the Approach Subfactor can withstand APA scrutiny.

25. DHA disregarded AccelGov's approach to [redacted] when it gave AccelGov its [redacted] weakness.



[redacted]

26. DHA gave AccelGov a weakness for its [redacted] (*See* Tab 499, AR 3095.) DHA said AccelGov "[redacted] (*Id.*) The Solicitation and AccelGov's proposal tell a different story.

27. The Solicitation directed offerors to "describe [their] approach to risks and managing risks." (Tab 154, AR 1191.) In doing so, offerors had to "identify risks . . . for providing services and propose mitigations." (*Id.*) AccelGov followed the Solicitation and presented its [redacted]. (*See* Tab 222, AR 1399.) There, AccelGov explained its approach and [redacted] process this way:

> [redacted]

(*Id.*) AccelGov also provided a [redacted] showing its in-depth approach:



[redacted]

[redacted]

(*Id.*) After that, AccelGov marched through [redacted]

[redacted]



[redacted]

(*Id.*) There is no question that AccelGov followed the Solicitation's instructions. There is also no question that it provided a "[redacted]" (*See* Tab 499, AR 3095.)

28. As for DHA's "[redacted] finding, neither the Solicitation's instructions nor the PWS use that phrase. And even assuming DHA intended to reference DDSB's "[s]upported [p]rograms, [p]rojects, and [i]nitiatives," this finding is still inconsistent with AccelGov's proposal. After identifying several supported programs and projects, the Solicitation discussed DDSB's support for the "MED365 and mJAD environments." (Tab 147, AR 1129.) It also listed DHAMPK-DaaS, MED365, and mJAD IT systems as three Risk Management Framework ATO designations DHA seeks to manage and unify through this contract. (*Id.*, AR 1128.) Consistent with that goal, the PWS tasked offerors with ensuring that all information systems "within area of responsibility (e.g., mJAD domain, MED365, applicable networks) are certified and accredited via the Risk Management Framework (RMF) or comparable accreditation process" and that the offeror "maintain and update in eMASS or other RMF system as required." (*Id.*, AR 1159.) This was part of the PWS's larger Risk Management Framework requirement that "Systems must have and maintain an [ATO] or [ATO with conditions] by contract award" and that offerors "[p]rovide documentation to achieve and maintain ATO[s] according to applicable DoD, MHS, and DHA requirements." (*Id.*, AR 1154.)

29. AccelGov said it understood that "[redacted]



[redacted]

[redacted].” (Tab 222, AR 1384.) Consistent with that understanding, AccelGov said it would “[redacted] (*Id.*, AR 1398.) AccelGov went on to say that “[redacted] (Tab 222, AR 1387.) And that [redacted] (*Id.* (emphasis omitted).) And AccelGov emphasized that it [redacted] (*Id.*, AR 1384-85.) So, AccelGov's proposal addressed the Solicitation's requirements. DHA's finding that AccelGov did not address its [redacted]—cannot be squared with what AccelGov wrote.

30. DHA's [redacted] weakness ignored portions of AccelGov's proposal and unreasonably penalized AccelGov's [redacted].

31. The Approach Subfactor directed offerors to “describe the overall timeline of activities from the Award Date through Transition and the implementation of its approach, to include critical milestones related to Transition.” (Tab 154, AR 1191.) AccelGov addressed that

requirement in proposal [redacted]. (*See* Tab 222, AR 1399.) There, AccelGov's [redacted]. (*Id.*)

AccelGov then laid out its [redacted]

[redacted]

(*Id.*, AR 1400.) That [redacted] included the [redacted]. (*See id.*)

32. Although DHA acknowledged that AccelGov provided a [redacted], it gave AccelGov a [redacted] weakness because there was supposedly "[redacted] (Tab 499, AR 3095.) Not exactly. AccelGov's [redacted] provided more detail than DHA gives it credit for. Here is what AccelGov said:



[redacted]

[redacted]

(Tab 222, AR 1399.) And DHA's weakness suffers from another flaw. It faults AccelGov for providing its [redacted]. But that was unreasonable, too.

33. The Court of Federal Claims interprets solicitations applying the same interpretive principles applicable to contracts. *Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1344 (Fed. Cir. 2021). And, unless a special meaning is clear, the Court of Federal Claims gives terms their ordinary meaning. *See G4S Secure Integration LLC v. United States*, 161 Fed. Cl. 387, 401 (2022). In this case, the question is whether the term "describe" required offerors to provide a timeline in narrative form, rather than as a figure or illustration. "Describe" generally means "to represent or give an account of in words," or "to represent by a figure, model, or picture[.]" *See Describe*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/describe (last visited Aug. 18, 2026). By its ordinary meaning, AccelGov "describe[d] the overall timeline" with its [redacted] (*See* Tab 154, AR 1191.) No [redacted]. Had DHA intended to require a [redacted], it should have said so. *See Blue Tech Inc. v. United States*, 155 Fed. Cl. 229, 240 (2021) (noting that if the agency sought a specific response in



[redacted]

proposals, "it could have crafted" the solicitation's language "more narrowly"). The Solicitation did not require a specific format. DHA's interpretation departed from the term's ordinary meaning, and was therefore unreasonable. As such, this weakness should not stand.

34. However, even if DHA's interpretation was reasonable (it is not), then the Solicitation was susceptible to two or more reasonable readings, meaning it was ambiguous. *See, e.g.*, *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004). There are two types of ambiguities: patent and latent. *See, e.g.*, *Sunshine Constr. & Eng'g, Inc. v. United States*, 64 Fed. Cl. 346, 358 (2005). A patent ambiguity "is one that is 'obvious, gross, glaring' or 'an obvious omission, inconsistency, or discrepancy in significance,' such that the error is readily apparent," while a latent ambiguity "is a 'hidden or concealed defect'" that may only become evident during evaluation. *Oenga v. United States*, 109 Fed. Cl. 108, 141 (2010), *on reconsideration in part*, 97 Fed. Cl. 80 (2011) (quoting *W. Bay Builders, Inc. v. United States*, 85 Fed. Cl. 1, 15 (2008)); *RELI Grp., Inc.*, B-412380, Jan. 28, 2016, 2016 CPD ¶ 51, at *6.

35. Here, it was not apparent or obvious that DHA would [redacted] DHA's interpretation only came to light after AccelGov received the notice from the contracting officer detailing this weakness. To the extent there was an ambiguity here, it was latent. For that reason, the Court should require DHA to either evaluate proposals in a manner consistent with AccelGov's reasonable interpretation or amend the Solicitation and allow the offerors with this weakness to resubmit proposals based on a common understanding. *See 22nd Century Techs., Inc.*, 176 Fed. Cl. at 398 n.4; *FirstLine Transp. Sec., Inc. v. United States*, 100 Fed. Cl. 359, 403 (2011); *W. Bay*



[redacted]

*Builders, Inc.*, 85 Fed. Cl. at 16-17; *Alliant Techsystems Inc. v. United States*, 74 Fed. Cl. 566, 577 (2007).

36. DHA's [redacted] weakness overlooked AccelGov's clear approach to meeting the PRS.

37. The Approach Subfactor also required offerors to describe their approach to meeting the performance requirements and service levels in the PRS. For this requirement, each offeror had to "describe how it attends to the interdependencies with the CIO & PEO MS (J-6) and other service providers[.]" (Tab 154, AR 1191.) AccelGov addressed this requirement in proposal [redacted]. (*See* Tab 222, AR 1399-400.) In the last sentence dedicated to this issue, AccelGov proposed to "[redacted]." (*Id.*, AR 1400) DHA seized on this one sentence and gave AccelGov [redacted] (Tab 499, AR 3095.) This finding is unreasonable on its face.

[5] "J-6" refers to the Program Executive Office Medical Systems ("PEO MS"), Chief Information Officer ("CIO"). (*See* Tab 147, AR 1145 (defining "CIO"), 1147 (defining PEO MS)); Tab 154, AR 1191 ("The Offeror will also describe how it attends to the interdependencies with the CIO & PEO MS (J-6) and other service providers, . . . the DHAGSC.").



[redacted]

38. In the very sentence DHA criticizes, AccelGov explained [redacted] (Tab 222, AR 1400.) AccelGov also described [redacted] (*Id.*) And if that were not enough, AccelGov's proposal said more about the PRS than DHA gave it credit for.

39. In addition to coordination, [redacted] of AccelGov's proposal said:

[redacted]

(Tab 222, AR 1400.) AccelGov's discussion also expressly incorporated proposal [redacted] by reference. (*See id.*) There, AccelGov provided more information about its approach to meet the PRS. For example, AccelGov said this about meeting the PRS's performance requirements:

[redacted]

[redacted]

40. AccelGov's incorporated narrative from proposal [redacted] also discussed the PRS's service level requirements. Specifically, AccelGov addressed service level requirements [redacted] when it proposed to [redacted] (Tab 222, AR 1387; *see also* Tab 122, AR 698, 709, 710.) AccelGov also explained that it would deliver "[redacted]. (Tab 222, AR 1390; *see also* Tab 122, AR 694.) Additionally, AccelGov said its "[redacted] (Tab 222, AR 1390; *see also* Tab 122, AR 716.) All of this goes to AccelGov's ability to successfully comply with the PRS, and incorporates the exact process AccelGov planned to [redacted]. DHA overlooked or disregarded this discussion when it gave AccelGov the [redacted] weakness, which made that weakness unreasonable. *See 22nd Century Techs., Inc.*, 176 Fed. Cl. at 397 (sustaining a protest where "[t]he [a]gency appears simply to have missed the relevant discussion").

41. AccelGov provided more than a "[redacted]," so the [redacted] weakness is unreasonable, too.

42. For the final Approach Subfactor requirement, offerors had to provide an "approach to implementing a unique Continual Improvement Practice (CIP)[.]" (Tab 154, AR



[redacted]

1191.) DHA thought AccelGov "[redacted] (Tab 499, AR 3096.) Once again, AccelGov's proposal told a different story.

43. AccelGov provided its [redacted], involving its [redacted]. (Tab 222, AR 1400.) AccelGov said it would "[redacted] (*Id.*) It then pointed to [redacted]:

[redacted]

---

[6] [redacted]



[redacted]

(*Id.*) AccelGov went on to [redacted] explanation:

[redacted]

(*Id.*, AR 1400.) If that were not enough, AccelGov also explained how it would [redacted]

[redacted]

(*Id.*) This is far more than a "[redacted]." (Tab 499, AR 3096.) This is a [redacted]. DHA's finding to the contrary was unreasonable. *See Barbaricum LLC*, 172 Fed. Cl. at 197; *Allicent Tech., LLC*, 166 Fed. Cl. at 115.

**DHA also unreasonably evaluated AccelGov's proposal in the Scenarios Subfactor**

44. For the Scenarios Subfactor, DHA gave AccelGov [redacted]. (Tab 499, AR 3096.) [redacted] was based, in part, on DHA's belief that AccelGov did "[redacted] (*Id.*) DHA also said AccelGov "[redacted]



[redacted]

[redacted] (*Id.*) These findings are inconsistent with the Solicitation's instructions and AccelGov's presentation.[7]

45. The instructions for each scenario included background information, an operational scenario and questions, among other things. (*See* Tab 277, AR 2179-82.) DHA said this for [redacted] operational scenario:

[redacted]

(*Id.*, AR 2180.) Offerors also had to provide their approach related to the following five questions:

[redacted]

[7] We recognize that offerors' written submissions were not evaluated for the Scenarios Subfactor and the recorded presentations are not in the administrative record. (*See* Tab 154, AR 1192.) However, AccelGov [redacted]. (*See* Tab 281.)



[redacted]

[redacted]

(*Id.*) [redacted] did not mention "[redacted] (*See id.*) In fact, the only reference to "[redacted] (*See* Tab 277, AR 2181.) And while some offerors did mention [redacted] as part of their response to [redacted] (*see* Tab 294, AR 2289, Tab 338, AR 2541, Tab 368, AR 2738), DHA's instructions did not require (or prompt) offerors to do so. Because Scenario #2 did not involve (or require discussion of) [redacted] DHA could not reasonably downgrade AccelGov for failing to address it.

46. Also, contrary to DHA's finding, AccelGov addressed the "[redacted] (*See* Tab 499, AR 3096.) In fact, the first slide of AccelGov's [redacted] provided an overview of the scenario and transition, and looked like this:

[redacted]



[redacted]

(Tab 281, AR 2215.) The second slide discussed a [redacted] (*Id.*, AR 2216.) AccelGov then went on to say:

[redacted]

(*Id.*, AR 2217.) To address these challenges, AccelGov proposed to [redacted] (*Id.*) All of this would result in positive "[redacted] (*Id.*) DHA's finding that AccelGov [redacted] (*See* Tab 499, AR 3096.)

47. DHA's finding that AccelGov "[redacted]" was wrong, too. (*See* Tab 499, AR 3096.) AccelGov provided a "[redacted] (Tab 281, AR 2218.) This included [redacted],[8] and policy hygiene to "[redacted]

---

[8] DHA also criticized AccelGov's [redacted], saying it "[redacted] (Tab 499, AR 3096.) But this ignores the portion of AccelGov's approach that includes a [redacted] (*See* Tab 281, AR 2219.)



[redacted]

[redacted].” (*Id.*) Moreover, AccelGov explained that its [redacted] (Tab 281, AR 2221.) And AccelGov said its “[redacted]” (*Id.*) DHA’s finding cannot withstand scrutiny.

48. Finally, DHA’s finding that AccelGov did not [redacted]” conflicts with AccelGov’s proposal. AccelGov opened its presentation with a discussion of the benefits of its “[redacted] and its [redacted] [redacted] (Tab 281, AR 2203.) When discussing [redacted] AccelGov’s presentation emphasized its “[redacted]” (Tab 281, AR 2227.) It also included [redacted]

[redacted]



[redacted]

(*Id.*, AR 2221.) DHA's finding that AccelGov did not provide [redacted] was unreasonable. (*See* Tab 499, AR 3096.) AccelGov's [redacted] under the Scenarios Subfactor cannot stand.

49. All of these errors prejudiced AccelGov. Competitive prejudice is an essential element of a viable protest. *See, e.g.*, *Raytheon Co. v. United States*, 809 F.3d 590, 597 (Fed. Cir. 2015) (quoting *Lockheed Martin Integrated Sys., Inc.*, B- 408134.3, et al., Jul. 3, 2013, 2013 CPD ¶ 169, at *5). This bid protest is a post-proposal, pre-award protest that does not challenge the terms of the Solicitation. To establish prejudice in those circumstances, a protester must show a "substantial chance of award," but for the agency's errors. *See Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013); *Med. Dev. Int'l, Inc. v. United States*, 89 Fed. Cl. 691, 701 (2009); *MCI Diagnostic Ctr., LLC v. United States*, 147 Fed. Cl. 246, 274-75 (2020). Under the "substantial chance" test, a protester is not required to prove that it would have received award but for the government's errors. *FirstLine Transp. Sec., Inc.*, 100 Fed. Cl. at 399-400; *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 743 (2000). Instead, it is enough that the protester show its chances were not insubstantial. *See Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003); *see also Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996). A protester can show prejudice by proving that had its proposal "been fairly and honestly considered . . . it was within the zone of active consideration." *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (quoting *Morgan Bus. Assocs., Inc. v. United States*, 619 F.2d 892, 895 (Ct. Cl. 1980)); *see also Allicent Tech., LLC*, 166 Fed. Cl. at 144. AccelGov meets this standard.



[redacted]

50. AccelGov received an Unacceptable rating in the Approach Subfactor because its proposal "[redacted] (Tab 499, AR 3096.) This Unacceptable rating, along with its associated weaknesses, overpowered AccelGov's [redacted] rating in the Scenarios Subfactor and resulted in an Unacceptable rating in the Technical Factor overall. (*Id.*, AR 3096 ("The overall Technical Factor was determined to be UNACCEPTABLE and did not meet the requirements of the solicitation, based on the accumulation of aspects (i.e., Significant Strengths, Strengths, Weaknesses, Significant Weaknesses, and Deficiencies) assigned and the relative important of the two subfactors.").) The Unacceptable ratings, in turn, resulted in AccelGov's exclusion from the competitive range. (*See Id.*, AR 3124 ("Offerors who will NOT remain in the competitive range as they are not among the most highly rated and all have a rating of Unacceptable in one or more Subfactor or Factor." (emphasis omitted)).)

51. Above, we proved that each of the weaknesses DHA gave AccelGov was unreasonable. But for DHA's unreasonable evaluation, AccelGov would have had [redacted] in the Approach Subfactor. (*See* Tab 499, AR 3095-97.) In that scenario, there is no question AccelGov would have at least an Acceptable rating in the Approach Subfactor. After all, proposals with no strengths and no weaknesses in a Subfactor were given an Acceptable rating. (*Id.*, AR 3065 ("The Offeror's Scenarios Subfactor proposal was rated as ACCEPTABLE as it met the requirements of the solicitation and had no Strengths/Significant Strengths or Weaknesses/Significant Weaknesses."), 3072 (same), 3083 (same).) A proposal with a weakness and no strengths would be rated Acceptable too. (*See id.*, AR 3090 ("The Offeror's Approach Subfactor proposal was rated ACCEPTABLE as it met the requirements of the solicitation and had one Weakness and no Strengths/Significant Strengths.").) In fact, even proposals with three

[redacted] still received an Acceptable rating in the Approach Subfactor. (*See id.*, AR 3072 (one significant weakness, no strengths, and an Acceptable rating), 3092 (three weaknesses, no strengths, and an Acceptable rating).) That point is important. It means that even if the Court does not agree with AccelGov on all [redacted] under the Approach Subfactor, it only needs to find that [redacted] was unreasonable to conclude that AccelGov should have been rated Acceptable for the Approach Subfactor.

52. With an Acceptable rating in the Approach Subfactor, and an [redacted] rating in the Scenarios Subfactor, along with [redacted], AccelGov's proposal would have been rated Acceptable overall under the Technical Factor. (*See* Tab 154, AR 2000 (An Acceptable rating is appropriate when "[a] proposal that meets the requirements of the solicitation and has any accumulation of significant strengths and/or strengths which is offset by any accumulation of weaknesses and/or significant weaknesses"); *see generally* Tab 499 (showing that all offerors with [redacted]).) With no Unacceptable ratings, AccelGov would have been in the competitive range. (Tab 499, AR 3124-25 ([redacted]).)

53. Once in the competitive range, AccelGov would have a substantial chance of award, as it would be within the zone of active consideration. *See CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (quoting *Morgan Bus. Assocs., Inc. v. United States*, 619 F.2d 892, 895 (Ct. Cl. 1980)); *see also Allicent Tech., LLC*, 166 Fed. Cl. at 144. If

the Court agrees with AccelGov, it will have [redacted]. Moreover, even if the Court does not agree with AccelGov on [redacted], and AccelGov enters the competitive range with some [redacted], it would have the opportunity to improve its proposal and price during discussions.[9] (Tab 499, AR 3125 ("The Government will enter discussions with all remaining Offerors in the competitive range."); Tab 154, AR 1198 ("This solicitation is . . . under the General Services Administration (GSA) Health Information Technology Services Multiple Award Schedule (MAS), in accordance with Federal Acquisition Regulation (FAR) Part 8.4 Federal Supply Schedules [and] Part 15, Contracting by Negotiation[.]")); 48 C.F.R. § 15.306 ("The contracting officer [] is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award.").

54. AccelGov's well-rated proposal and [redacted] would give it a substantial chance of award against the other offerors in the competitive range. There is no questions DHA's unreasonable actions have prejudiced AccelGov. The Court should sustain this protest.

**Prayer for Relief**

Wherefore, AccelGov respectfully requests that the Court sustain this protest and enter an order:

---

[9] The Court need not "predict precisely how [AccelGov] would revise its proposal in light of meaningful discussion" nor must it "foresee exactly how that revised proposal would be evaluated" where the facts "show that [AccelGov] would have a substantial— or at least not an insubstantial—chance of receiving the award following the opportunity to make revisions." *See Precision Asset Mgmt. Corp. v. United States*, 135 Fed. Cl. 342, 355 (2017) (finding that the protester was prejudiced where the agency failed to have meaningful discussions).



[redacted]

A. Declaring that DHA's evaluation and competitive range determination were arbitrary, capricious, an abuse of discretion, and contrary to law;

B. Permanently enjoining DHA from proceeding with award based on the current, unreasonable evaluation and competitive range determination;

C. Ordering DHA to perform a new evaluation and issue a new competitive range determination; and

D. Awarding AccelGov such other and further relief as this Court may deem just and proper, including, without limitation, bid and proposal costs;

Dated: August 18, 2026

Respectfully submitted,

/s/ W. Brad English
W. Brad English
Emily J. Chancey
Taylor R. Holt
Hunter M. Drake

*Attorneys for AccelGov, LLC*

**OF COUNSEL:**
MAYNARD NEXSEN PC
223 Washington St. NE, Suite 500
Huntsville, Alabama 35801
(256) 512-5705
benglish@maynardnexsen.com
echancey@maynardnexsen.com
taholt@maynardnexsen.com
hdrake@maynardnexsen.com

**Certificate of Service**

I hereby certify that I caused a copy of the foregoing to be served on all counsel of record via email on August 18, 2026.

/s/ W. Brad English
W. Brad English



[redacted]